UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>    Plaintiff,<br><br>    v.<br><br>PAYBASICS, INC., a corporation, also d/b/a Livewire Commerce,<br><br>TODD HATCH, individually and as an officer of PAYBASICS, INC., and<br><br>JIMMY SHIN, individually and as an officer of PAYBASICS, INC.,<br><br>    Defendants. | Case No. 15-cv-10963<br><br>**COMPLAINT FOR PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF** |

Plaintiff, the Federal Trade Commission ("FTC"), for its Complaint alleges:

1. The FTC brings this action under Sections 13(b) and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b) and 57b, and the Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. §§ 6101-6108, to obtain permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief for Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and the FTC's Trade Regulation Rule entitled Telemarketing Sales Rule ("TSR" or "Rule"), 16 C.F.R. Part 310.

**JURISDICTION AND VENUE**

2. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345, and 15 U.S.C. §§ 45(a), 53(b), 57b, 6102(c) and 6105(b).

1

3.  Venue is proper in this district under 28 U.S.C. § 1391(b) and (c), and 15 U.S.C. § 53(b).

## PLAINTIFF

4.  The FTC is an independent agency of the United States Government created by statute. 15 U.S.C. §§ 41-58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce. The FTC also enforces the Telemarketing Act. Pursuant to the Telemarketing Act, the FTC promulgated and enforces the TSR, 16 C.F.R. Part 310, which prohibits deceptive and abusive telemarketing acts or practices.

5.  The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act and the Telemarketing Act and to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies. 15 U.S.C. §§ 53(b), 56(a)(2)(A)-(B), and 57b.

## DEFENDANTS

6.  Defendant PayBasics, Inc. ("PayBasics") also doing business as Livewire Commerce, is an Illinois corporation with its principal place of business in Chicago, Illinois. PayBasics transacts or has transacted business in this district and throughout the United States.

7.  Defendant Todd Hatch ("Hatch") is an officer and co-founder of PayBasics. At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of PayBasics, including the acts and practices set forth in this Complaint. Defendant Hatch resides

2

in this district and, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

8. Defendant Jimmy Shin ("Shin") is an officer and co-founder of PayBasics. At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of PayBasics, including the acts and practices set forth in this Complaint. Defendant Shin resides in this district and, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

## COMMERCE

9. At all times material to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## Overview of Merchant Accounts/Credit Card Laundering

10. A merchant account is a type of account that allows businesses to process consumer purchases by a credit or debit card. Merchant accounts are available through financial institutions called merchant acquiring banks or "acquirers." Without access to a merchant acquiring bank that is a member of the credit card associations, such as MasterCard or VISA, merchants are not able to accept consumer credit or debit card payments. Merchant acquiring banks frequently enter into contracts with payment processors that manage the bank's merchant processing program. Payment processors in turn frequently enter into contracts with multiple ISOs to sign up merchants for merchant accounts. ISOs may, in turn, enter into contracts with sub-ISOs or sales agents to assist them in selling their services.

3

11. Before a payment processor will establish a merchant account, the merchant has to meet the bank and processor's underwriting criteria. Some companies are denied merchant accounts because the payment processor concludes that the company applying for the merchant account is too much of a risk. For example, the payment processor may conclude that the merchant might be at risk of operating in an illegal way or might be concerned that the merchant will generate excessive consumer chargebacks.

12. If a merchant is not able to obtain a credit card merchant account or does not wish to use its own name to establish a merchant account, it may recruit another company (that does have a merchant account or that can readily open a merchant account) to process credit card transactions through the recruited company's merchant account. This is known as credit card laundering and is an unlawful business practice.

13. The recruited company might agree to this arrangement in exchange for a fee. The recruited company can launder sales from multiple companies (that do not have merchant accounts) through its own merchant account, thereby collecting significant amounts of money.

14. Credit card laundering negatively affects commerce in the marketplace. In the event of fraud, consumers who have suffered a financial loss will file complaints against the (recruited) company that charged their accounts, rather than the merchant that initiated the charges. The confusion about what company caused consumer injury can make it easy for unscrupulous merchants to avoid detection by consumers and by law enforcement. Furthermore, even if the bank and processors terminate the account that was used to launder credit card payments, the bank and processor may not learn the identity of the true culprit that caused excessive chargebacks. The true culprit is then able to perpetuate the scheme as long as it can

recruit other companies to provide access to their merchant accounts.

## DEFENDANTS' BUSINESS ACTIVITIES

### Overview of Defendants' Credit Card Laundering Scheme

15. Since July 2010, Defendants PayBasics, Todd Hatch, and Jimmy Shin (collectively "Defendants") have operated as sales agents for independent sales organizations ("ISOs") that arrange for merchants in need of credit and debit card processing services to obtain merchant accounts with a financial institution.

16. In September 2010, PayBasics entered into an "Agent Agreement" with an ISO named CardFlex Financial Services, LLC ("CardFlex"). Later, in or around January 2011, PayBasics entered into an "Agent Agreement" with another ISO named PowerPay, LLC ("PowerPay"). CardFlex and PowerPay are registered ISOs of merchant acquiring banks. Under these Agent Agreements, PayBasics agreed to act as an agent for CardFlex and PowerPay and solicit merchants that were bona fide businesses and met certain underwriting requirements. PayBasics received a percentage of the sales processed in merchant accounts at CardFlex and PowerPay, including those discussed below, from merchants recruited by PayBasics. In connection with the Agent Agreements, PayBasics assisted merchants with completing merchant account applications and presented the applications to CardFlex and PowerPay for approval.

17. From 2010 through 2012, Defendants helped set up merchant accounts in the name of shell companies JC Enterprises, LLC ("JC Enterprises") and Marble Base, Inc. ("Marble Base") (collectively, the "Shell Companies"). These merchant accounts were controlled by principals of the Tax Club, Inc. ("Tax Club"), an illegal telemarketing operation. Defendants helped arrange for the Tax Club principals to use the Shell Companies' merchant accounts to

5

process credit card payments for sales transactions between a number of different third-party entities ("Third-Party Entities") and consumers – a process that the Telemarketing Sales Rule classifies as "credit card laundering." On information and belief, most, if not all, of the Third-Party Entities are now defunct or have been the subject of other law enforcement actions.

18. The Third-Party Entities whose sales transactions were laundered through the Shell Companies' merchant accounts marketed and sold, online and through telemarketing, various purported business opportunities and development services, including website development and marketing services.

19. For example, one Third-Party Entity named BES Enterprises, LLC was an illegal telemarketing operation that was sued by the State of Arizona for engaging in deceptive telemarketing practices.

20. In return for allowing the Third-Party Entities access to the Shell Companies' merchant accounts, the Tax Club principals received a percentage of the sales processed by the Third-Party Entities, as well as consumer leads from those entities in some instances. The Tax Club principals' use of merchant accounts that Defendants helped secure to process credit card transactions for the Third-Party Entities, who are not disclosed on the merchant account applications, is prohibited by VISA and MasterCard. Essentially, Defendants helped grant the Third-Party Entities unauthorized access to the credit card system that they would otherwise be unable to obtain.

21. Defendants knew that the Tax Club principals were using the Shell Companies' merchant accounts to launder sales transactions generated by the Third-Party Entities. At times, Defendants discussed with the Tax Club principals which Shell Merchant, JC Enterprises or

6

Marble Base, should be used to set up a merchant account to process sales transactions for the Third-Party Entities.

22. For example, in a March 2011 email, a Tax Club principal asked Defendant Shin to follow-up on "New Merchant Accounts for Outside People," and asked "what entity are you going to set those up under?" Defendant Shin replied: "I'd like to get it under JC [Enterprises] …but that may not be possible anymore. Todd [Hatch] and I are currently discussing the best strategy to manage your outside account and keep them out of trouble long term." Later, in February 2012, when the Tax Club principals asked whether they could process sales for another merchant through JC Enterprises, Defendant Shin responded that he "recommended having a new entity/signer with stronger financials" and noted that "JC [Enterprises] is already stretched thin at PowerPay, and difficult to hide that from other processors."

23. In January 2013, the FTC, along with the State of New York and the State of Florida, filed a Complaint against the Tax Club and related entities and principals for using a variety of deceptive sales tactics during their telemarketing calls to induce consumers to purchase their services. *See FTC et al. v. The Tax Club et al.*, No. 13-cv-210-JMF (S.D.N.Y. filed January 9, 2013). In June 2014, the Tax Club and its principals entered into Stipulated Final Judgments and Orders for Permanent Injunctions and Monetary Relief.

24. Between September 2010 and January 2013, approximately $1.3 million in sales transactions generated by the Third-Party Entities had been laundered through the Shell Companies' merchant accounts that Defendants helped secure.

25. Defendants received a portion of the fees that the ISOs CardFlex and PowerPay earned from the Shell Companies' merchant accounts. Defendants collected fees from the ISOs

7

based on the amount of these laundered sales.

## Defendants Presented and Helped Secure
## Merchant Accounts For Shell Companies at CardFlex

26. From December 2010 through February 2011, Defendants submitted merchant account applications to CardFlex in the name of JC Enterprises. The merchant account applications listed Jacob Cheha ("Cheha") as the sole owner and managing member for JC Enterprises. Cheha was a childhood friend of one of the Tax Club's principals.

27. JC Enterprises is a shell company that conducted no business and had no employees. It was incorporated in November 2010, just three weeks before PayBasics started to submit merchant applications in its name, and its bank account was set up in December 2010.

28. Defendants submitted at least nine merchant account applications for JC Enterprises to CardFlex. The applications described the business services for JC Enterprises as "small business startup consulting and coaching," and identified the marketing methods to include telemarketing. Although the applications were in the name of JC Enterprises and Cheha, Defendants submitted them to CardFlex at the direction of the Tax Club principals. Defendant Shin falsely verified to CardFlex in several merchant account applications that he had physically inspected the business premises of JC Enterprises.

29. When Defendant Shin submitted the first applications for JC Enterprises to CardFlex in December 2010, he asked CardFlex employees to "pay special attention to this and see that it gets approved" and noted that "[t]his is a very important account for us . . . ."

30. CardFlex informed Defendant Shin that it was likely going to decline the JC Enterprises' applications because they could not verify its business and its only identified principal (Cheha) had a poor credit history. To overcome CardFlex's concerns, Defendant Hatch

8

agreed to indemnify CardFlex for any losses it sustained for providing merchant accounts to JC Enterprises. CardFlex ultimately approved merchant accounts for JC Enterprises in early 2011.

31. The merchant accounts approved by CardFlex for JC Enterprises used different DBAs, including, for example, "Profit Fusion," "Self Income System," and "Digital Wave," to correspond to the product or offer name used by the Third-Party Entities whose sales transactions were processed through these merchant accounts. The DBA names appear on consumers' credit card statements as the billing descriptor. Therefore, consumers would identify the charge as associated with the Third-Party Entity even though the credit card transaction was processed through a laundered merchant account.

32. After CardFlex deducted its fees (which it split with Defendants), the proceeds from the Third-Party Entities' sales processed through the JC Enterprises' merchant accounts were deposited into JC Enterprises' bank accounts, which were controlled by the Tax Club principals (a Tax Club employee had signatory authority over the JC Enterprises' bank accounts). The Tax Club principals deducted their percentage from the proceeds and then transferred the remaining proceeds to the Third-Party Entity that generated the sales transactions.

33. PayBasics also submitted merchant applications to CardFlex in January 2011 for the Tax Club principals in the name of Marble Base as part of the credit card laundering scheme.

34. Marble Base is a shell company that conducted no business and had no employees. It was formed by one of the Tax Club's principals in May 2010. The merchant account applications that Defendants submitted to CardFlex listed as the business premises for Marble Base an address for a UPS Store in Arizona on one application and a virtual office in Nevada on another application. Defendant Shin falsely verified on the merchant applications

that he physically inspected the merchant applicant's business premises.

35. CardFlex approved merchant accounts for Marble Base. The merchant accounts used different DBAs, including, for example, "Vital Interests Protection" and "BES Enterprises," to correspond to the product or offer names sold by Third-Party Entities whose sales transactions were processed through these merchant accounts.

36. By mid-2011, the merchant accounts at Card Flex for each of the Shell Companies were shut down for excessive chargebacks. Approximately $950,000 in sales by Third-Party Entities had been processed through these merchant accounts before they were shut down. At least three merchant accounts had overall chargeback rates exceeding 33% (and one as high as 60%), levels that are indicative of widespread deceptive or fraudulent practices by the entities generating the sales transactions.

### Defendants Continued to Help Secure Merchant Accounts for JC Enterprises at PowerPay

37. In 2011 and 2012, Defendants submitted merchant account applications for JC Enterprises to PowerPay. In order to secure the JC Enterprises' merchant accounts at PowerPay, Defendants Hatch and Shin each signed "Co-Signer" forms for one JC Enterprises account and "Additional Owner/Officer" forms for another JC Enterprises account.

38. The JC Enterprises merchant accounts set up at PowerPay were also used to process sales transactions generated by Third-Party Entities. These merchant accounts processed more than $370,000 from March 2011 through January 2013.

39. Most of the sales were processed through one JC Enterprises merchant account using the DBA "Networker Corp Services." The application submitted by PayBasics for that merchant account identified the service provided as "Business Services – Tax Preparation and

10

Entity Formation," and specified the service was sold through telephone orders. After PowerPay deducted its fees (which it split with Defendants), the proceeds from sales processed through this merchant account were deposited into a JC Enterprises bank account controlled by the Tax Club principals. The Tax Club principals deducted their percentage from the proceeds and transferred the remaining funds to the Third-Party Entity that generated the sales transactions.

## VIOLATIONS OF THE TELEMARKETING SALES RULE

40. Congress directed the FTC to prescribe rules prohibiting abusive and deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C. §§ 6101-6108, in 1994. The FTC adopted the original Telemarketing Sales Rule ("TSR") in 1995, extensively amended it in 2003, and amended certain sections thereafter. 16 C.F.R. Part 310.

41. The Third-Party Entities that generated sales transactions processed through the Shell Companies' accounts, that Defendants helped secure, are "sellers" and "telemarketers" engaged in "telemarketing" as defined by the TSR, 16 C.F.R. § 310.2(aa), (cc), and (dd).

42. Under the TSR, a "merchant" means a person who is authorized under a written contract with an acquirer to honor or accept credit cards, or to transmit or process for payment credit card payments, for the purchase of goods or services or a charitable contribution. 16 C.F.R. § 310.2(s).

43. The TSR prohibits: (1) a merchant to present to or deposit into, or cause another to present to or deposit into the credit card system for payment, a credit card sales draft generated by a telemarketing transaction that is not the result of a telemarketing credit card transaction between the cardholder and the merchant; (2) any person to employ, solicit, or otherwise cause a merchant, or an employee, representative, or agent of the merchant, to present to or deposit into

11

the credit card system for payment, a credit card sales draft generated by a telemarketing transaction that is not the result of a telemarketing credit card transaction between the cardholder and the merchant; or (3) any person to obtain access to the credit card system through the use of a business relationship or an affiliation with a merchant, when such access is not authorized by the merchant agreement or the applicable credit card system. 16 C.F.R. § 310.3(c).

44. The TSR also prohibits a person from providing substantial assistance or support to any seller or telemarketer when that person "knows or consciously avoids knowing" that the seller or telemarketer is engaged in any act or practice that violates Section 310.3(c). 16 C.F.R. § 310.3(b).

45. Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c) and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## Count I

## Credit Card Laundering

46. In numerous instances and without the express permission of the applicable credit card system, Defendants have employed, solicited, or otherwise caused the Shell Companies, or representatives or agents of the Shell Companies, to present to or deposit into, the credit card system for payment, a credit card sales draft generated by a telemarketing transaction that is not the result of a telemarketing credit card transaction between the cardholder and the Shell Companies, as described in Paragraphs 15 to 39 above, that violate Section 310.3(c)(2) of the TSR.

47. Defendants' acts or practices, as described in Paragraph 46 above, are deceptive telemarketing acts or practices, that violate the TSR, 16 C.F.R. § 310.3(c).

## Count II

### Assisting and Facilitating Credit Card Laundering

48. In numerous instances, Defendants provided substantial assistance or support to the Shell Companies and Third-Party Entities that Defendants knew, or consciously avoided knowing, were engaged in acts or practices that violate Section 310.3(c) of the TSR, as described in Paragraphs 15 to 39 above.

49. Defendants' acts or practices, as described in Paragraph 48 above, are deceptive telemarketing acts or practices, that violate the TSR, 16 C.F.R. § 310.3(b).

## CONSUMER INJURY

50. Consumers have suffered substantial injury as a result of Defendants' violations of the TSR. In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

51. Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC. The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies to prevent and remedy any violation of any provision of law enforced by the FTC.

52. Section 19 of the FTC Act, 15 U.S.C. § 57b , and Section 6(b) of the Telemarketing Act, 15 U.S.C. § 6105(b), authorize this Court to grant such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the TSR, including the rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies.

## PRAYER FOR RELIEF

Wherefore, Plaintiff FTC, pursuant to Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b) and 57b, and Section 6(b) of the Telemarketing Act, 15 U.S.C. § 6105(b), and the Court's own equitable powers, requests that the Court:

A. Enter a permanent injunction to prevent future violations of the FTC Act and the TSR by Defendants;

B. Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act and the TSR, including but not limited to, rescission or reformation of contracts, restitution, the refund of monies paid, the disgorgement of ill-gotten monies, and pre-judgment interest; and

C. Award Plaintiff the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

Respectfully submitted,

JONATHAN E. NUECHTERLEIN

FEDERAL TRADE COMMISSION
General Counsel

Dated: __December 7, 2015_____                ___/s/ Darren H. Lubetzky_____
                                               Darren H. Lubetzky
                                               Savvas S. Diacosavvas
                                               Brian N. Lasky
                                               Federal Trade Commission
                                               Northeast Region
                                               One Bowling Green, Suite 318
                                               New York, NY 10004
                                               Tel: (212) 607-2829
                                               Fax: (212) 607-2822
                                               Email: dlubetzky@ftc.gov
                                               Email: sdiacosavvas@ftc.gov
                                               Email: blasky@ftc.gov

                                               James Davis
                                               Federal Trade Commission
                                               Midwest Region
                                               55 West Monroe Street, Suite 1825
                                               Chicago, IL 60603
                                               Tel:  (312) 960-5611
                                               Email:  jdavis@ftc.gov

                                               Attorneys for Plaintiff
                                               FEDERAL TRADE COMMISSION

15